CHANCERY

Case 2.

April 14.

Judgment for
Grayson
against Bul-
lock.

Sale of Bul-
lock's land to
Lilly, under
the execution

## Grayson *vs.* Lilly and Bullock.

Appeal from the Jefferson Circuit; JOHN P. OLDHAM, Judge.

*Executions. Error. Restitution. Sheriff's Sales. Constitutional law. Debtor and Creditor. Equity. Costs.*

Judge MILLS delivered the Opinion of the Court.

GRAYSON, the appellant, recovered judgment against John Bullock, in covenant, and issued his first execution, dated the 9th of November, 1819.

By virtue of that execution, the land of Bullock was sold, and Thomas Lilly became the purchaser, on a credit of one year, and executed bond with security accordingly.

But after execution issued on said bond, Lilly with his security, moved the court below to quash the bond, relying on the ground that the law which authorized and directed the sale on that length of credit was unconstitutional, and the court sustained the motion and quashed the bond.

Grayson then issued another execution on his judgment. But at that time the Bank of the Commonwealth was created, and the act had passed which subjected his judgment to a stay of two years, unless he would endorse on his execution a willingness to accept, at par, the paper of the bank of the Commonwealth, then greatly depreciated. He submitted to that act, made the endorsement, and Bullock replevied the debt for three months. At the end of three months the amount of this replevin bond was collected in paper of the bank of the Commonwealth.

Grayson then prosecuted his writ of error in this court, to reverse the judgment of the court below between himself and Lilly, quashing the sale bond first given by Lilly, on the purchase of Bullock's bond.

On hearing, this court reversed that judgment and reinstated the sale bond given by Lilly as valid.

On the return of the mandate of this court to the court below, Grayson issued his execution on said sale bond against Lilly and his surety, for the amount.

To enjoin this execution Lilly prosecuted this bill in equity, making both Grayson and Bullock defendants, relying on the foregoing facts, and alleging that, on his purchase of the land of Bullock, he had executed to Bullock a writing, agreeing to reconvey the land to Bullock, if Bullock refunded his money in one year, and if he did not, that the land was to be sold, and the sale bond to Grayson paid, and the residue, if any, was to go to Bullock. He insists that as Bullock has since paid the judgment under which the land was sold, that payment enures to his benefit, and that Bullock is willing that it,

GRAYSON
vs.
LILLY AND
BULLOCK.

Grayson's
answer.

shall do so, and extinguish the sale bond, and he, therefore, prays a perpetual injunction.

Grayson admits that after the sale bond was quashed he pursued his judgment against Bullock, and was compelled to endorse a willingness to take paper, then depreciated nearly one half, and that he prosecuted the writ of error to save himself from this great loss; that on reversing the judgment and reinstating the sale bond he became bound to account for and pay back to Bullock the amount of Commonwealth's paper which he had received. He denies any knowledge of a friendly arrangement or purchase of the land for Bullock, as stated in the bill, or that he has any knowledge that Bullock is willing that the amount of notes on the bank of the Commonwealth which he had recovered from him on his orignal judgment, may be set off against, or placed to the credit of Lilly, on the sale bond, and insists that he has not a right himself to give such a credit, while Bullock holds his right of restoration of the paper currency. But declares his willingness to give credit for that paper, if Bullock is willing, at its real value in silver, and not at par. He also insists that as his judgment, which sounded in damages obtained in an action of covenant, did not bear interest till the sale to Lilly, he ought to be allowed the interest from the date of the sale bond, and also the sheriff's commission for making the sale, which was something considerable and was included in the sale bond.

Bullock made no answer to the bill.

On hearing, the court below decreed a perpetual injunction to the whole sale bond, except the interest accruing thereon from its date to the date of the replevin bond given by Bullock in discharge of the execution on the judgment, issued after the sale bond was quashed, and also gave to Lilly his costs. From this decree Grayson has appealed to this court.

If we admit that the court below has assumed the correct criterion of settling this controversy, we cannot perceive how the sheriff's commission for making the sale could be refused to the appellant.

The sale was conducted fairly, and was held by this court to be valid, and was invalidated without the fault and against the consent of Grayson, by the wrongful act of Lilly in attacking the sale, and as Grayson was bound to the sheriff, Lilly ought to account to Grayson for the commission. For it is evident that the subsequent discharge of the original judgment by Bulluck did not include or discharge this commission on the sale rightly prosecuted by Grayson.

But the main question is, what credit ought to be given on the sale bond, for the paper of the bank of the Commonwealth, received by Grayson on his executions against Bullock? Ought that paper to be credited at par, or according to the scale of depreciation, as the proof is clear that the depreciation was great, and Grayson insists that he is entitled to the difference between it and specie, and that the injunction ought to be dissolved to that amount. We take it for granted that some credit ought to be given, because Bullock by not answering the bill, has given his tacit assent to it, and Grayson has assented if Bullock does. But without the assent of Bullock, it is evident that the credit could not be given, unless under some special circumstances such as the insolvency and non-residence of Bullock or the like, none of which are pretended. For if we suppose Lilly and Bullock to be at variance, what would have been the course that each could take by law, on the reversal of the judgment quashing the sale bond? Bullock might have set aside all the executions against him, and have procured restitution of what he had paid, and Lilly was bound to pay up for the land, and to keep it for his remuneration, so that Lilly would have been entitled to the land— Grayson to its price, and Bullock to a restoration of the value of his bank paper, and it is only in consequence of the friendly agreement between Bullock and Lilly when the sale was made, converting the sale virtually into a mortgage, and Grayson's subsequent assent thereto in his answer, that any credit can be given. For to this agreement, at its date and even since, Grayson appears to be an entire stranger. He was not party or privy and did

GRAYSON
vs.
LILLY AND
BULLOCK.

Where, on the quashing a sale of land under execution, made on a credit, the plaintiff takes an execution on his original judgment, & endorses it for Bank paper, and collects that depreciated one half; and afterwards the the judgment quashing the sale and sale bond is reversed, the plaintiff may proceed on the sale bond for specie, the defendant may have restitution of the value of the Bank paper, and the purchaser shall hold the land.

GRAYSON
vs.
LILLY AND
BULLOCK.

not even know of its existence. He denies any knowledge of it, and none is proved.

But with his assent to the credit *sub modo*, insisting upon the credit only at its real value as the court shall adjudge, we are brought to the question what the credit ought to be; whether a paper dollar for a silver dollar, or the paper dollar at its real value?

But if in such case defendant and purchaser concur, the value in specie, not dollar for dollar, of bankpaper paid on the execution on the judgment may be credited on the execution on the sale bond, and the defendant retain his land.

By the sale, Lilly became the debtor to Grayson, and Bullock was discharged. On quashing that sale, Lilly was discharged and Bullock again became the debtor, and in that situation Grayson compelled him to pay up the nominal amount in paper. On the reversal of the judgment quashing the bond, Lilly again became the debtor, and of course entitled to the land, and Grayson became the debtor of Bullock to the value of the bank paper which he had received. Now, if we suppose the endorsement on an execution, where specie was due, that bank paper would be taken, to be a solemn contract between debtor and creditor, so full of merit as to be enforced in a court of conscience, we cannot perceive how the benefit of such a contract can be claimed by Lilly. It was not made with him, nor can he claim the benefit of it. It was made between Grayson and Bullock alone, and Bullock got the benefit of it, and now has a right to be remunerated for what he paid. Grayson never did make such a contract with Lilly, to take from him paper of the bank of the Commonwealth, in discharge of his bond, which he had given to Grayson for the land of Bullock, and he is, therefore, to him, under no such obligations. If Grayson, with his bond quashed, and having no other mode of proceeding to recover his demand, except against Bullock, said to him, "I will take depreciated paper at par," it does not follow that with his bond on Lilly restored to him, he is bound to say the same thing to Lilly, and make with him a like engagement.

Statute allowing a replevin of two years held to be unconsti-

But we are not prepared to admit that the endorsement on an execution, pursuant to the act, is a contract between debtor and creditor, which ought to be enforced in a court of conscience. The demand of Grayson here, was due on a contract, and

judgment was rendered for the amount thereof, before the act, subjecting creditors to a suspension of two years, unless they consented to accept paper on the bank of the Commonwealth, was in existence. The act, therefore, was in contravention of his constitutional rights, as held by this court, in the case of Lapsley vs Brashear, and Blair &c. vs. Williams, 4 Litt. Rep. 34—47; which decisions we still approve, especially as they have since virtually received the sanction of the Supreme Court of the nation, in the case of Ogden vs Saunders, 12 Wheat. 213.

GRAYSON vs. LILLY AND BULLOCK.

tutional as to all contracts made before the enactment, according to Blair and Williams &c.

What then did Grayson do when his bond was destroyed, and he was driven back to his original judgment against Bullock? Rather than run the risque and incur the delay and expense of litigating this question against Bullock, while his debt was perhaps still in jeopardy; he submitted to the hard terms of an unconstitutional act, and took from Bullock, a part only of his debt, which in the course of subsequent events, he is bound to restore, and yet it is decreed by the court below, that he shall still abide by these terms dictated to him, by an act which was inoperative and void. It might as well be contended that if he was now restoring the paper to Bullock, he should restore to him the nominal amount in specie, as that he should give credit for that amount to Lilly. Indeed he cannot be bound to give Lilly a greater credit than he is bound to restore to Bullock, and that is the real value of the paper which he got.

Endorsement that Bank notes would be received on the execution was not a contract between the parties and not obligatory as such on plaintiff.

Indeed if the act in question was strictly constitutional, it must be admitted that its terms were hard, and that the money in specie was really due to Grayson, and that he could take it with a clear conscience, the act notwithstanding, and that if he had by any means have got it, no court of conscience would draw back from him, the difference between specie and paper: so no court of conscience ought to take from him the legal advantage which he holds, as he is endeavouring to receive no more by it, than what he has a right to in conscience, according to the principles recognized by this court, in

Equity will not enjoin a party from using an advantage at law, fairly obtained, which he can retain with a good conscience.

the case of Salter and Stapp vs. Richardson, 3 Mon. 204. That he has the advantage at law, cannot be denied. If he has not, this application ought not to have been made in a court of chancery, but in a court of law, which can see to the proper execution, and prevent abuses of its own process. But here no motion or proceeding in a court of law could avail the appellee. There the appellant has a valid sale bond for the whole demand in specie, on which he is entitled to execution, and he is attempting to recover no more by virtue thereof than conscience allows him to receive, and, therefore, a court of conscience ought not to withhold from him what conscience allows him to take. For no principle is better settled than that a court of equity will not take away a legal advantage, which can be held conscientiously.

If the relief laws were constitutional, yet they were unjust, and equity ought not to interpose to enforce against a party who had escaped them at law.

Let us then, for the sake of the argument, suppose that this system of interference between debtor and creditor, although it extends its smiles upon the debtor and frowns upon the creditor class of the community, without intending to relieve the whole, must of necessity, belong to the powers of a state government; and that the calamities incident to society, will, at some times imperiously demand it, although it relieves no calamity but that of debt, if calamity it can be called, and brings a calamity, at the same time, on all creditors. Let us admit that the legislature can pare down the honest debts of its citizens, a fourth, a half, or nineteen-twentieths, without regard to the interest of the creditor, because the necessities of society are supposed to require it, still it must be admitted that the eternal rules of right and wrong are the same, and the moral sense must say that the part of the debtor taken away by legislation still belongs, in conscience, to the creditor, and the claims of morality and conscience still bind the debtor to pay it, unless his conscience is conformed to the legislative standard, instead of those moral principles which exist in despite of all legislation. If so, is it right to apply to a court of conscience to enforce such laws, and ought the chancellor to lend himself to subvert the principles of conscience? Certainly not. He ought to

leave the debtor to gain the advantages of such laws if he could, and not to aid him when he loses his way, or by his decree to take away the conscientious claim of his adversary. Such laws, if valid, ought to be construed strictly, almost as much so as penal laws, and the conscientious power of the chancellor ought not to be called upon to enforce their provisions. For, however expedient or politic or constitutional they may be, they never can be just.

It may be said that the endorsement and acceptance of the bank paper, was an accord and satisfaction of the judgment. If so, Lilly was no party to the accord or the satisfaction. He once, by the purchase of Bullock's land, had compelled Grayson to accept his sale bond, with security, in satisfaction of his judgment. This satisfaction he afterwards wrested from Grayson, against his consent, by his motion to quash, and left Grayson to get satisfaction as he could. Grayson, embarrassed with the imposing authority of an act of the legislature, and not of his own free consent, submitted to the rigid terms dictated by the act, rather than expend his debt in contesting its validity, and thus received a part, and but a part of his demand, not by consent, but by way of obedience to his government. Such an accord could not be enforced in a court of law, on common law principles. For voluntary accords alone are there enforced; much less ought it to be enforced by the solemn decree of the chancellor. It was not a matter of choice, but yielded to under a constraint bordering on duress, while equity, justice and good conscience dictated to him no such terms. If, on the hypothesis that the act was constitutional, it was an advantage which he must gain by mere law and not by equity; if an accord and satisfaction, not of his choice, but dictated to him by a superior power, and enforced upon him without escape, unless he expended his debt to resist it, are not proper subjects to be enforced by the chancellor in favor of a complainant, much stronger is the reason against such relief by the chancellor, when it is known by settled adjudication, that not only equity and conscience, but the written constitution of his country,

GRAYSON
vs.
LILLY AND
BULLOCK.

Endorsement of the execution that Bank paper would be received, and payment, and receipt of the currency accordingly, not regarded as a valid accord and satisfaction in equity, because the consequence of the unjust impositions of the invalid Statute.

GRAYSON
vs.
LILLY AND
BULLOCK.

Mandate.
Costs not allowed complainant in a
bill for credits
which he had
not asked for
before suit,
and which he
obtains but
by consent.

shielded him from these hard terms, and that the act which dictated them was inoperative and void.

The court below, therefore, erred in enjoining the commission of the sheriff on the sale, and, also, in giving credit for a greater amount, on account of the bank paper paid by Bullock, than what said paper was really worth in specie, at the time it was paid, and for this reason a majority of the court, the Chief Justice dissenting, concur in reversing the decree, with costs, and issuing a mandate to the court below to enter a decree in conformity with this opinion, leaving the complainant below to pay the costs of the proceedings in that court, as no application was made to obtain this credit, till the bill was filed by either Lilly or Bullock, and no such credit could be given without Bullock's assent.

*Chief Justice* BIBB, *not concurring with the majority of the court, delivered his own opinion.*

I dissent from the opinion and decree of the court as pronounced in this cause.

I find by recurring to the transcript and decision of the suit in this court upon the writ of error by Grayson vs. Lilly, (and referred to in Grayson's answer,) these facts.

Statement of
the case.

In September, 1819, Grayson sued Bullock upon a covenant dated in March, 1818, for one thousand dollars, payable in any current bank notes, fourteen months after date, with a credit endorsed for one hundred and thirty three dollars thirty four cents: the verdict was for $927 33, in damages. Execution issued on the 9th November, 1819, on this judgment; the *venditioni exponas* to sell the land, issued 16th February, 1820; both these executions, (as appears by the transcript in the writs of error, and by the copies filed in this chancery case,) were endorsed by the plaintiff, that he would accept notes of the bank of Kentucky or its branches, in payment. The sale bond by Lilly, for the purchase of Bullock's land under execution, bears date on the 9th of March, 1820. The execution on the sale bond issued on the 15th of March, 1821, endorsed.

by the plaintiff, that notes on the bank of Kentuc- <span style="float:right">GRAYSON</span>
ky or its branches, or notes on the bank of the Com- <span style="float:right">vs.</span>
monwealth, or its branches, would be received in <span style="float:right">LILLY AND BULLOCK.</span>
payment. The motion to quash this sale bond was
made by Lilly, on the 28th March, 1821, and the
court at that term quashed the bond. To this judg-
ment Grayson sued his writ error against Lilly,
bearing teste on the 31st January, 1823; the sum-
mons was executed on Lilly, in March, 1823, and
the case was decided in this court upon the 17th
October, 1824, upon the authority of Moore vs.
Miller, 1 Litt. Rep. 356.

By the record in this cause it appears, that on the <span style="float:right">Agreement</span>
day of the sale of Bullock's land, Lilly, the purchas- <span style="float:right">between Bul-</span>
er, executed to Bullock an obligation, reciting the <span style="float:right">lock and Lil-</span>
sale under Grayson's execution, and also under four <span style="float:right">ly.</span>
others, and the purchase made by him, under those
executions, and agreeing that if Bullock paid the
said money for which the land was sold, within the
year, the land should be Bullock's, if not so paid,
then Lilly was to be at liberty to give up the land
to sale under execution for the said debts, and the
balance, if any, to be the property of said Bul-
lock.

After the sale bond given by Lilly and his surety
was quashed, Grayson issued an execution on his
original judgment, endorsed, that notes on the bank
of Kentucky or its branches, or notes on the bank
of the Commonwealth, or its branches, would be
accepted in payment; this execution was put into
the hands of the sheriff, on the 14th April, 1821,
and satisfied by Bullock on the 12th May, 1821,
in notes, agreeable to the endorsement of the exe-
cution, which were received by Grayson of the
sheriff, as admitted in his answer. These notes
were worth then eighty cents to the dollar, as ap-
pears by the depositions in the cause. Having thus
received satisfaction of his original judgment, Gray-
son issued an execution against Lilly and Rogers on
the sale bond, bearing teste on the 19th April, 1825,
which is stayed by the injunction and is the cause
of controversy in this case.

GRAYSON
vs.
LILLY AND
BULLOCK.
———————
Decree of the
circuit court

The court dissolved the injunction as to the interest on the money due by the sale bond, from its date to the time the money was made on the execution against Bullock, amounting to $72 58, and gave damages on that sum of ten per cent and perpetuated the injunction for the residue.

Point of controversy stated.

Grayson has not credited the execution with any thing, on account of his receipt from Bullock. Yet expresses a willingness to credit the paper so received, with Bullock's assent, at its value when received, but claims the bond as a specie debt, to be lessened only by the value of the paper when paid by Bullock. This is now, under the effect of the proceedings and the decree, the real controversy. The interests of Lilly and Bullock are in unison, one and the same, and both contend that the sale bond is paid and extinguished by Bullock.

Dissent from
the doctrine
of the case of
Blair and
Williams and
Lapsley and
Brashear.

That I do not assent to the positions taken in the opinion delivered in the case of Lapsley vs. Brasher, and Blair vs. Williams, I hardly need say: the principles asserted in the petition for a re-hearing, I believe to be correct, and that they will stand the test of time, and the scrutiny of reason. The legislative powers therein asserted, I believe to be inherent in every well organized government, inseparable from the Legislative department, and essential to the preservation and well being of society. The discreet exercise of such powers upon a proper emergency will be sustained; an indiscreet exercise of them upon an unfit or dubious occasion, will be repelled and corrected, by public sentiment operating through the medium of representation. However devoutly it is to be wished that the country may never experience a calamity which shall call for the exercise of those powers of legislation, yet looking at the nature of man, his condition here, and judging from history and experience, and all the ills which flesh is heir to, it is not to be expected that future generations in all time to come, will enjoy, here on earth, an uninterrupted progression of peace, prosperity and happiness. I have no inclination to revive the discussion of the principles involved in those cases, but to avoid the dis-

cussion, as far as is consistent with my duty, is my earnest desire, as I have said on a former occasion. My opinion in this case being formed upon reasons wholly distinct from the decisions of Lapsley vs. Brashear and Blair vs. Williams, I have said only so much as appeared to my mind, to be necessary and proper to avoid any implied acquiescence, and called for by the quotation in the opinion of the majority of the court.

To the doctrine quoted from the case of Salter and Stapp vs. Richardson, I do not assent.

With these exclusions of a conclusion in *futuro*, I proceed to explain the reasons by which my mind is led to the conclusion that the decree of the circuit court is more favorable to Grayson than it should have been, and, consequently, ought not to be reversed, on his complaint and assignment of errors.

The judgment against Bullock and execution thereon, the sale of Bullock's land thereby, and the bond of Lilly the purchaser, are all inseparably connected. The sale bond given by Lilly is founded on the execution, and that is founded on the judgment. The executions against Bullock of *fieri facias* and *venditioni exponas*, the sale bond given by Lilly, the purchaser, and execution on that sale bond are all concreted and inseparably connected: they are all one mass of process to the execution of the judgment against Bullock; they are emanations from the judgment. If by the reversal of the original judgment, before payment of the sale bond and receiving a deed, the title of the purchaser was not vacated, yet upon such reversal the money for which the property sold would belong to defendant in execution, the right of Grayson to have the money on the sale bond, would be gone, and the defendant, Bullock, would be entitled to have it, not Grayson. So if Grayson accepts from Bullock satisfaction of the original judgment, Grayson's right to the money from Lilly is gone, and Bullock's right to have it of Lilly is complete. Grayson cannot receive satisfaction of his judgment of Bullock, and after having obtained that, claim to have the mo-

Vol. VII.          G

*Margin notes:*

GRAYSON vs. LILLY AND BULLOCK.

Dissent from the case of Salter and Stapp.

When the purchaser obtain the sale of the land, and his bond given for the money to be quashed, the defendant becomes again the debtor; if he then satisfy the execution, issued by plaintiff on the original judgment, endorsed for Bank paper, and the sale and bond are afterwards restored, he, the original defendant, became entitled to the bond and the purchaser holds the land

ney from Lilly for Bullock's land. By the sale, Lil-
ly became the debtor to Grayson, and Bullock was
discharged. On quashing that sale Lilly was dis-
charged, (so long as that judgment quashing the
sale and sale bond remained unreversed,) and Bul-
lock again became the debtor. In that condition
and relationship of creditor and debtor when sub-
sisting between Grayson and Bullock, Grayson is-
sued his execution against Bullock, endorsed by an
agreement to receive Bank notes, put into the hands
of the sheriff who did collect it of Bullock on the
12th day of May, 1821, and paid it over to Gray-
son who accepted it. By this Grayson's judgment
was discharged and satisfied by Bullock. By vir-
tue of this and by his writing from Lilly, Bullock,
in equity and in good conscience, was entitled to
have the land which had been sold to satisfy that
judgment; and Grayson had no farther claim on his
judgment. But whether this satisfaction was ac-
cepted in bank notes, under par, or in horses, or
cattle, or other property at high valuation, is whol-
ly immaterial in my judgment—it was Grayson's
own act; he did accept the satisfaction of his judg-
ment. The after prosecution of the writ of error
in 1823, and the reversal of the judgment quashing
the sale bond could not make Bullock the debtor of
Grayson, nor affect Bullock's right to have his land
back from Lilly. Can Bullock recover back the
bank notes he paid to the sheriff in May, 1821, and
which Grayson received? It was paid by Bullock,
then the debtor, and received and accepted by Gray-
son, then the creditor of Bullock.

If the plain-
tiff in such
case attempt
to proceed on
the sale bond,
equity ought
to restrain
him.
I am at a loss to conceive by what form of action
or mode of proceeding Bullock can recover back
from Grayson the bank notes. Between Grayson
and Bullock the judgment was settled by execution,
satisfied and accepted by Grayson. Lilly is the
man who would have been entitled to recover back
his money of Grayson, if not knowing of the pre-
vious satisfaction by Bullock, Lilly had paid Gray-
son. But knowing of the satisfaction of the judg-
ment so accepted by Grayson, Lilly has properly
come into a court of equity to restrain Grayson from
coercing payment of that which Grayson is wrong-

fully endeavouring to collect from him; and the decree of the court ought to have gone, as I think, farther to relieve Lilly than it has gone: Grayson was not entitled to the interest which was decreed him. After accepting satisfaction of his judgment, I think Grayson was not at liberty to meddle with the sale and sale bond; it was Bullock's in equity, and Grayson ought to be restrained from proceeding on the sale bond against Lilly. Near two years after he received payment from Bullock, Grayson prosecuted his writ of error against Lilly. By the reversal he has recovered costs in this court and in the court below, these costs are not included in the amount of the sale bond, and are not involved in this controversy, and, therefore, I say nothing as to Lilly's right to them. If Grayson had desired to continue Lilly as his debtor instead of Bullock, and to prosecute his writ of error, he ought not to have proceeded on his original judgment, he ought not to have accumulated the costs and sheriff's commissions on that judgment, he ought not to have accepted satisfaction of that judgment.

I think Bullock and not Grayson is entitled to the benefit of the sale bond, and that by virtue of the satisfaction of the judgment by Bullock, and of the writing between Bullock and Lilly, the bond is satisfied and extinguished as between them ; and if the circuit court had decreed an injunction against the whole it would have conformed to my opinion of the justice and equity of the case.

*Denny*, for appellant; *Talbot*, for appellees.

**Margin notes:** GRAYSON vs. LILLY AND BULLOCK.

Purchaser of the land and defendant having originally agreed the payment by defendant of the sale bond should annul the sale, its payment by defendant discharges the judgment and vacates the sale.